# Wytheville

## NATHAN SCHWEITZER v. WILLIAM G. STROH AND SIMON J. LAPOF.

June 22, 1944.

Record No. 2799.

Present, All the Justices.

The opinion states the case.

*Lawrence H. Hoover*, for the appellant.

*Laird L. Conrad* and *Glenn W. Ruebush*, for the appellees.

SPRATLEY, J., delivered the opinion of the court.

The proceedings in this cause were instituted by Honora E. Toppin and S. F. Toppin against Susan B. Falls and others to obtain a partition or sale of the lands of which Frances V. Kelly died seized and possessed, situated in the city of Harrisonburg, Virginia. The cause was regularly matured as to all parties, including two infant defendants and a soldier in the United States Army.

The court being satisfied that partition in kind could not

be had, sale of all of the described lands was ordered. Included were the three contiguous lots of land here involved, described as Lots 1, 2, and 3. Lot number 1 was improved by a frame dwelling house and lots 2 and 3 by a three-story brick building and some wooden sheds. The brick building was under lease to the Carver Produce Company, which was engaged in buying and selling poultry and eggs and in processing chickens and turkeys for large city markets. The three lots adjoined property occupied by the City Produce Exchange, a business establishment of similar character.

L. B. Yates, a real estate agent for eighteen years in the city of Harrisonburg, after testifying that he was familiar with the property in question, having recently inspected it, appraised lot number 1, with its improvements, as having a value around $2,000, and lots 2 and 3, with the brick building thereon, as worth between $11,000 and $12,000.

J. W. Hess, a real estate broker, in business in the same city for fifteen years, testified that he had recently made an examination of the properties, and he valued lot number 1 at $1,800, and lots 2 and 3, with improvements thereon, at $12,000.

The fair monthly rental value of lot number 1 was placed at between $17.50 and $20 a month, and of lots 2 and 3 about $100 a month.

George S. Harnsberger and Ward Swank were appointed commissioners, and directed, after having given bond with surety in the sum of $15,000, to make sale of all of the lands of which Mrs. Kelly died seized and possessed in Harrisonburg, at public auction to the highest bidder. After advertising the sale, in a lengthy advertisement containing descriptions of the properties and the terms and conditions of sale, pursuant to the provisions of the decree, to-wit, twice a week for two weeks in a newspaper published in the city of Harrisonburg, the commissioners offered all the properties for sale on June 26, 1943, at which sale lots 1, 2, and 3 were sold to William G. Stroh and Simon J. Lapof, the appellees, for $17,900, the last and highest bid therefor. The plant

fixtures and equipment in the brick building, being owned by the tenant, were specifically excluded from the sale.

On June 30, 1943, the commissioners filed their report of sales, in which they stated that the bidding for lots 1, 2, and 3 started at $9,500. They reported that they considered all of the lands "well sold," and recommended the confirmation of the sales.

On July 8, 1943, Nathan Schweitzer tendered an upset bid of $23,000 for lots 1, 2, and 3. He asked that the sale to the appellees be not confirmed, on the sole ground that the price obtained at the sale was inadequate, in view of the value of the building and its equipment to the poultry business, especially his business, under wartime conditions and restrictions. No charges were made that it was insufficiently advertised, unfairly conducted, or vitiated by fraud. He prayed that, in the event his bid was not accepted, the bidding be reopened at $23,000, and the lots sold to the highest subsequent bidder. As evidence of his good faith, he tendered a certified check in the sum of $8,000. His petition was filed and notice of a hearing thereon duly given.

The owners of the property filed answers, including the infant and soldier defendants, who answered by their duly appointed guardian *ad litem* and attorney, respectively. Each prayed that the petition be treated as an exception to the report of the sale of the special commissioners.

On July 20, 1943, evidence in support of the petition was heard *ore tenus* before the chancellor.

Schweitzer, a resident of the city of New York, testified that he had been engaged there in the dressed poultry business for fifty years, supplying hotels, restaurants, the government, and railroads; that he obtained a large amount of his product from Harrisonburg and Rockingham county, Virginia, purchasing both from the Carver Produce Company and the City Produce Exchange, in the relative proportion of 60% and 40%; that he handled in one week in the fall of 1942, over a quarter of a million pounds of turkey from that area; that he was familiar with both companies and with the properties on which they operated; that on

June 28, 1943, while in New York, he learned, through a long distance telephone conversation with H. H. Weaver, manager of the City Produce Exchange, that the premises occupied by the Carver Produce Company had been sold two days before for $17,900; that he had not known prior thereto that the property was to be offered for sale; that he thought the sale price was inadequate, in view of existing conditions in the poultry industry by reason of the present emergency, the importance of Harrisonburg and Rockingham county in the poultry business, and the fact that the property was well adapted to the conduct of the poultry business; that it was very essential to his business to secure poultry from that area, using this language: "This building is very essential to us in securing a lot of supplies, especially turkeys, from this territory, as there are very few dressing plants in the country;" that he owned no poultry dressing plants; that he purchased dressed poultry from a number of producers in Harrisonburg and Rockingham county; that he knew nothing about real estate values in either that city or county; that the building and plant were especially valuable to him because he could not build a new plant like it for $23,000, nor get the necessary machinery and ice boxes because of scarcities and priorities; and that the City Produce Exchange was unable to supply his needs and he was unable to buy from the appellees, who were themselves engaged in the live poultry business in New York City.

The appraisers were recalled and they testified that they had no knowledge of the needs of the poultry business nor of the peculiar value of the property to one who could use it in connection therewith, under present conditions, and consequently they had not taken such matters into consideration when they made their appraisements.

Hess, however, said that he knew the property in question was used as a poultry processing plant and that Harrisonburg and Rockingham county were known throughout the country as a great poultry producing area; that the appraisement he had placed upon the property before the sale represented a fair market price therefor; and that "Except

for somebody who, for some reason, wanted to pay more than the normal price for the property," the value that he had given in his appraisement was still a "fair, normal price."

Yates, when asked if the property did not sell at a fair price, said, "I have no doubt it did." He further said "It never entered my head what value the properties might have to someone in New York engaged in the poultry business," and if it had, he "probably" would have increased his appraisement.

S. F. Toppin and his wife, Mrs. Honora E. Toppin, were part-owners of the property. Mr. Toppin was present at the sale and made the next highest bid of $17,800. He said that if he had known that there were persons of the type of Schweitzer interested in the property, he would have offered more.

Russell Eagle, another witness, a poultry dealer, testified that on the following Monday after the sale, in a conversation with Stroh and Lapof about their bargain, he was told by Stroh that they were "prepared" to make the property bring $30,000,—"because they wanted it, I guess."

One of the commissioners testified that, while he thought the property brought an "unusually good price as a local proposition, based on its rental or other general values, local values," he was unaware of the "extra value" of the property brought about by the conditions mentioned.

There were at least four bidders present at the sale, including Toppin and Carver of the Carver Produce Company, all of whom were financially able to purchase the property. Toppin and Carver actually bid on the property. There was also present H. H. Weaver, the manager of the City Produce Exchange.

The highest bid was received at an open judicial sale, duly advertised, fairly conducted, and with spirited competition. The evidence presents no question or suggestion of fraud, sharp practice, mistake, accident, or misconduct, either in the proceedings or in the advertisement and conduct of the sale.

The real and controlling question for our decision is whether the sum of $17,900 is a grossly inadequate price

for the property. Reliance is based solely on an upset bid, approximately 28% greater.

We have, on many occasions, considered the principles governing the acceptance or refusal of upset bids in judicial sales. From the decided cases, certain guiding principles have been stated time and time again. Those principles set out, in the following cases, the general doctrine which has become the settled law in this State.

In *First Nat. Bank* v. *Wright*, 153 Va. 429, 150 S. E. 255, we reversed the trial court for accepting a final upset bid increasing the amount of the bid of the purchaser at the original sale from $7,000 to $10,500, a 40% increase. There Judge Campbell, now Chief Justice, said:

"The fact that the land at a resale brought a substantial sum in excess of the sum realized at the first sale is not conclusive of the question that the land in the first instance sold for an inadequate price. The burden of showing that the original bid is grossly inadequate is upon those who allege it."

In *Dunn* v. *Silk*, 155 Va. 504, 155 S. E. 694, 71 A. L. R. 667, a resident of New York put in an upset bid of $23,100 for a valuable tract of land in Bath county, sold in a partition suit at public auction for $21,000. In this case Mr. Justice Holt reviewed many of the earlier cases, and the course of the decisions with respect to the effect of upset bidding in judicial sales. The conclusions which we there reached may be briefly stated as follows:

"A sale will not be set aside for mere inadequacy of price unless that inadequacy be so gross as to shock the conscience, or unless there be additional circumstances against its fairness.

"When inadequacy of price is alone relied upon to support an upset bid, where the sale was fairly held, it should not be received unless it affirmatively appears from the evidence that the inadequacy was gross."

While the object of a sale is to secure the best price for the property, this must be accomplished "by the establish-

ment of and adherence to rules which will inspire confidence in the stability of judicial sales."

"Public bidding should be encouraged and not chilled. Certainly it would not be fostered were it known that the successful bidder would take nothing but the right to bid again at another sale.

" 'The highest bid at an open judicial sale, fairly conducted, after full notice, in the face of such competition as can be attracted, is a fair and just criterion of the value of the property at that time. After-stated opinions, affidavits of under-value and the like are regarded with little favor, and are entitled to little weight in comparison with the fact established by the auction and its results.' " *Nitro-Phosphate Syndicate* v. *Johnson*, 100 Va. 774, 42 S. E. 995; *Benet* v. *Ford*, 113 Va. 442, 74 S. E. 394.

A confirmation of a sale is a matter within the sound judicial discretion of the court, in view of all the circumstances, and sales fairly made should not be set aside merely because the purchaser has gotten a good bargain. There must be due regard to the rights and interests of all concerned.

"The settled principles governing judicial sales in cases like this are applicable alike to infants and adults and have never been disturbed by this court because infants were interested in the subject matter of the sale." *Shultz* v. *Hughson*, 134 Va. 497, 114 S. E. 591; *Sterling* v. *Trust Co.*, 149 Va. 867, 141 S. E. 856.

In *Keyser* v. *Federal Land Bank*, 169 Va. 368, 193 S. E. 489, where an upset bid represented an increase of 32% over the original sale price, Mr. Justice Gregory reviewed the authorities and expressly approved the foregoing principles.

In *Chandler* v. *Chandler*, 174 Va. 95, 5 S. E. (2d) 523, property appraised at $6,000 had been sold at public auction for $3,050. An upset bidder offered $4,000, an increase of 30%. In *Prettyman* v. *Chandler*, 174 Va. 99, 5 S. E. (2d) 521, a farm appraised at $8,100 was sold at public auction for $3,550. An upset bid was offered in the sum of $3,-

932.50, which was increased to $4,082.50, and later to $4,100, a final increase of 15%.

In each of these last two cases, Mr. Justice Hudgins, in opinions reversing the trial court for refusing confirmation of the original sales, specifically referred to and expressly approved the principles stated in the foregoing cases.

The facts in this case are clear, simple and undisputed. The legal principles are not complicated. The necessities of an upset bidder furnish the principal ground for asking that the sale to the appellees be not confirmed. Opposed to this is every sound and logical reason supporting the stability of a judicial sale where an adequate price has been obtained under proper conditions surrounding the sale.

Schweitzer admits that he does not know the market value of the property. He is willing, however, to pay a larger price than the one obtained at the sale because of the peculiar situation which confronts him. It is natural that the owners of the property desire all they can get for it. Unexpected wealth is as welcome as Santa Claus.

Harrisonburg is a great poultry producing center. It is the site of an annual "Turkey Festival," which it advertises at home and abroad. It would reflect upon the intelligence of the bidders and persons present at the auction sale to hold that they were unconscious of the importance of Harrisonburg as such a center. They were not unaware of the increase in demand and price for poultry products. No subject in America is more widely discussed than the rationing of food and the results thereof. That the bidders were cognizant of the unusual conditions is evidenced by the fact that property appraised at $14,000 sold for $17,900. None of the bidders, including the tenant of the property who owned the plant equipment, and a part-owner of the property, thought it advisable to offer more.

It is significant that the appraisers, when recalled, were not asked or required to give a new estimate of value or state whether the auction price was inadequate or grossly inadequate. Of course, they knew an increased price could be obtained for the property after the filing of the upset

bid; but that was a subsequent development, which may not have arisen if there had been no sale.

It is doubtless true that neither the appraisers nor the commissioners knew of the peculiar interest of the appellant in the property nor of its peculiar value to his business. There was no reason why they should know. He did not own such a plant for processing poultry. Not until he discovered that a sale of the property had been made to persons from whom he was unable to obtain dressed poultry did he become interested in its purchase for use as such a plant. It is not difficult to imagine his position if the property had been bought by Carver or by someone who would have continued his source of supply. The necessity of protecting his source of supply apparently did not arise until the property passed to other hands.

The construction which the witness, Eagle, placed upon the statement attributed to Stroh bares the whole situation as between the appellant and the appellees. Each desired the property for reasons peculiar to his business, and was willing to go far to accomplish his desire.

The necessities of sellers or buyers often affect the sale price of property; but they do not create a true test of its fair, normal, material value. Property which one is forced to sell at any price frequently brings less than its real value. Property which one buys through necessity often brings more than its real worth.

If the necessity of the appellant was brought about as a result of the sale to another, it cannot be said that the value of the property before the sale was affected thereby.

It may not be out of the way to observe here that if the owners had contracted to sell the property on June 26th for $17,900, they would have been held to their contract, even though Schweitzer might have offered them twice as much on June 27th. If the government had offered $100,000 on June 28th, because it needed the property for its peculiar and special purposes, that would not have changed its value as of June 26th.

Courts are not required to get the last dollar value out

of property. They must see that it is sold for an adequate price. In the exercise of their discretion, they may refuse to confirm a sale where the price is grossly inadequate. It is not their function to act as arbitrators in cases of business rivalry, or as agencies to satisfy the necessities or whims of an upset bidder. Spite, malice, or newly formed personal interests are not allowed to upset the rule of public policy which dictates stability of public sales.

 A learned, able, and experienced judge heard the witnesses testify. By reason of that advantage and his situation as the local judge, he was further qualified to pass upon the questions involved. In the exercise of the sound judicial discretion with which he was charged, he refused to accept the upset bid, and we are of opinion that, upon the facts and the law applicable, he did not abuse his discretion. The decree of the trial court must be affirmed.

*Affirmed.*

HUDGINS, J., dissenting.

The dominant question presented in this record is whether the owners or the highest bidder at the auction sale is entitled to the difference between $17,900, the amount of the bid, and $30,000, the market value of the property ascertained between the date of the auction and the date the sale was asked to be confirmed.

The majority opinion emphasizes the efforts of this court to stabilize judicial sales. This is important, but the primary object of a judicial sale is to obtain the highest price for the property consistent with the rights of all parties concerned. The highest bidder at a judicial sale only becomes a party to the suit when the property is cried out to him at his bid. The fact that he makes the last and highest offer for the property does not complete the contract of sale. This contract is not completed until the offer is accepted and confirmed by the court. There is a distinction in such bidder's rights before and after confirmation of the sale.

This distinction is pointed out with force in the com-

paratively recent case of *O. K. Warehouse* v. *West,* 151 Va. 809, 145 S. E. 253, in which the following excerpts from *Berlin* v. *Melhorn,* 75 Va. 639, are quoted with approval:

" 'We think it may be safely laid down, as a general rule, deducible from the authorities, that after a judicial sale has been absolutely confirmed by the court which ordered it, it will not be set aside except for fraud, mistake, surprise, or other cause for which equity would give like relief, if the sale had been made by the parties in interest, instead of by the court. But where the objection is to the confirmation, the rule is more liberal.

" 'The principles applicable to such cases have been affirmed by several recent decisions of this court. In the opinion of the court by Judge Staples, in *Brock* v. *Rice and others,* 27 Gratt. (68 Va.) 812, it is said that a decree is a judgment of the court which determines the rights of the parties. Such a decree possesses the same force and effect of any other adjudication by a court of competent jurisdiction. But before confirmation the whole proceeding is *in fieri,* and under the control of the court, until then, the accepted bidder is not regarded as a purchaser. His contract is incomplete and he acquires no independent right to have it perfected. * * * Whether the court will confirm the sale must, in a great measure, depend upon the circumstances of each particular case. It is difficult to lay down any rule applicable to all cases, nor is it possible to specify all the grounds which will justify the court in withholding its approval * * * .

" 'The court, however, in acting upon a report of sale, does not exercise an arbitrary, but a sound legal, discretion, in view of all the circumstances. It is exercised in the interest of fairness, prudence and with a just regard to the rights of all concerned.' "

The court then stated:

"Examination of the decided cases will reveal that gross inadequacy of price is practically the chief, certainly the most frequent, ground which will justify the court in refusing to confirm the sale of the real estate made by its re-

ceiver or commissioner. *Shultz* v. *Hughson,* 134 Va. 497, 114 S. E. 591; *Walker* v. *Smith,* 144 Va. 824, 130 S. E. 768."

The rights of infants and the rights of a soldier in service are involved. All the owners, and the commissioners who reported the sale, asked that the offer of $17,900 made at the auction be rejected and that the property be re-offered for sale. The peculiar facts and circumstances which bring this case within the exception to the general rule are as follows:

For eleven years immediately preceding the sale, the property had been used as a produce house operated by a concern which bought and sold poultry and eggs in large quantities. The building is peculiarly adapted to this business. Local real estate dealers and others fixed the market value of the property between $14,000 and $16,000. This valuation was based on its then annual rental, its location and other local conditions. The commissioners, basing their recommendation on these known facts, stated in their report that the bid of $17,900, submitted by William G. Stroh and Simon J. Lapof at the auction on June 26, 1943, was a good offer and recommended that the sale be confirmed. Subsequently, when the sale of the property became generally known to people engaged in the produce business, it was ascertained that the value of this particular class of property had been greatly enhanced to the wholesale poultry trade because of conditions created by the war. Indeed, it is said by one witness that, due to these conditions, Harrisonburg has become "The Poultry Capitol of the East." Nathan Schweitzer, a resident of New York City engaged in the poultry business, heard of the sale and immediately came to Harrisonburg, viewed the property and filed an upset bid in the sum of $23,000. As evidence of his good faith, he filed a certified check for $8,000. He prayed that the bidding be reopened and started at his offer of $23,000. As soon as this was done, the commissioners investigated the conditions and ascertained that the market value of this property to persons engaged in the produce business was from $25,000 to $30,000. A witness stated that one of the purchasers told

him before sale that he expected to run the property up to $30,000 rather than miss buying it. Upon ascertaining these facts, the commissioners changed their opinion and requested the court, as heretofore stated, not to confirm the sale. Each and every one of the many owners joined in this request. If the bid is not rejected, the owners of the property will lose at least $12,100, which sum will inure to the benefit of the highest bidder on June 26, 1943.

It seems to me that these peculiar facts, which were unknown to the general public until after June 26, 1943, are sufficient to justify the rejection of the original bid and the resale of the property, the bidding to begin at the sum of $23,000. If this is not done, the efforts of the court to "stabilize judicial sales" will result in the sale of property at a sacrifice and a substantial loss to the true owners of the land.

BROWNING, J., dissenting.

I dissent from the majority opinion. Of course I am well aware that this court, in a number of cases, has frowned upon the entertainment of upset bids where judicial sales are made openly and fairly after having been duly advertised. When property has been knocked off to the highest bidder, he becomes favored by the court. This is in the interest of the stability of judicial sales. To hold that all parties are firmly bound is to lend confidence to such transactions. The motive is a commendable and worthy one and enjoys the *imprimatur* of the law.

There are, however, exceptions to all cases and the circumstances which obtain here lead me to the conclusion that there is presented a setting of facts which should cause its release from the fetters of *stare decisis* that a higher conception of justice be conserved.

The appellees were the highest bidders at the gross price of $17,900. The appellant entered the picture by offering an upset bid of $23,000, and avouched his good faith by tendering a certified check in the sum of $8,000. If this

were all of the narrative no plausible objection could be made to the views of the majority. But it is not the whole story.

There are persons interested as part owners of the property who are under, what we call in law, disabilities. There are infants and there are those who are engaged in the defense of their country. Of course they were, in a technical legal sense, represented in the manner required by law. But the material gain to them which would be produced by the excess price is a matter of moment. They should be and are the objects of the tender care and solicitude of the courts.

The record discloses the fact that there was a lurking, latent, unobservable element of value in the property. It was a value peculiar to it and to its setting and its *locus*. It was what might almost be called an imponderable, except it was capable of being weighed and appraised by those who knew of its existence. This is made to stand out boldly by the magnitude of the upset bid and by the fact that one of the appellees said, with respect to the value of his bargain, that he was prepared to make the property bring $30,000.

This element of worth was unknown to the commissioners and therefore it was not embraced in the advertisement. Had they been aware of it it would have been emphasized and stressed and the scope of the publishment would have been wider and more extensive.

If this were all to be said it would perhaps be not enough. More, the appellant was not present at the sale. He was not as one who stood by refusing to bid and saw the property sold to another. He was unaware of the sale. He was in the city of New York and when he learned of it he made haste to submit his offer to the court.

To my mind there is here presented a set of circumstances which should take this case from the general rule. Its receipt by the court as a just exception is as lofty in concept as the rule itself.

A blind and slavish adherence to precedent becomes a fetish and is an ally of injustice.

The peculiar value, to which I have alluded, of the prop-

erty and the adaptation of the latter to the peculiar use for which it was desired by both the appellant and the appellees is set forth *in extenso* in the majority opinion and need not be repeated.