COURT OF APPEALS OF VIRGINIA

Present: Chief Judge Decker, Judge O'Brien and Senior Judge Humphreys
Argued at Richmond, Virginia

CARTOGRAF USA, INC.

v.     Record No. 0236-24-2

COMERICA BANK, A TEXAS
 BANKING ASSOCIATION, ET AL.

OPINION BY
JUDGE MARY GRACE O'BRIEN
JUNE 3, 2025

FROM THE CIRCUIT COURT OF CHESTERFIELD COUNTY
M. Duncan Minton, Jr., Judge

Tara L. Chadbourn (Jesse B. Gordon; Jason D. Wright; Reaves
PLLC; Curtis, Mallet-Prevost, Colt & Mosle LLP, on briefs), for
appellant.

Timothy G. Moore; W. Thomas Chappell (Jennifer J. West; Matthew
Yanovitch; James R. Harvey, III; Spotts Fain PC; Woods Rogers
Vandeventer Black PLC, on brief), for appellees.


A parcel of real property belonging to Cartograf USA, Inc. (appellant) was sold in a judicial

auction for $16.5 million to satisfy appellant's debts owed to Comerica Bank (Comerica) and

Choate Construction Company (Choate). Appellant alleges that the circuit court erred in (1)

accepting the commissioner in chancery's amended report and ordering the sale; (2) denying a

temporary injunction stopping the property's auction; and (3) confirming the amended report of the

special commissioner and approving the sale.

BACKGROUND

A U.S. District Court in Michigan awarded Comerica default judgment against appellant for

$9.7 million in principal, $1,459.75 in per diem interest, $32,736 in attorney fees, and $1,199.73 in

costs. Comerica domesticated the judgment and filed an action to compel judicial sale of

appellant's real property in Chester, Virginia. The property was encumbered by various mechanic's liens, which later were consolidated and are now held by Choate.

Appellant filed its answer and counterclaim late, and the court granted Comerica's demurrer and motion to strike. Comerica successfully moved for (1) default judgment, (2) appointment of a commissioner in chancery, and (3) an issuance of a decree of reference. After finding that Robert W. Partin was qualified, the court appointed him as the commissioner in chancery, ordering him to "tak[e] information and evidence" and to issue a report identifying all interested parties, the owners and their interests, all lien holders, their liens and their priority, the fee simple and rent and profit values of the property, and any taxes owed. The court also directed Partin to make recommendations regarding the sale of the property. The court instructed Partin to "give notice of the time and place fixed for any hearing," "before proceeding to execute the [d]ecree of [r]eference," and ordered that "all costs of and commissioner's fees in this matter and the sale . . . shall be paid from the proceeds of the sale or rental of the property."

I. *Commissioner in Chancery Reports*

Partin filed an initial commissioner in chancery report in August 2023. The report included two property appraisals from August 2021, which appellant had provided during the commissioner's collection of the evidence. Specifically, Partin had asked the parties to stipulate that potential rents or profits from the property would be insufficient to satisfy appellant's debt within five years. Refusing the stipulation, appellant instead requested a new "professional evaluation" of the property, the cost of which "would be paid for through the proceeds of any sale." As a reference, appellant submitted the two 2021 appraisals "for the record." Partin did not conduct a hearing but, based on the record, concluded that "[i]nasmuch as the improvements of the property remain incomplete, the property, as is, has little to no potential rents and profits value" and that "the rents and profits would be insufficient to satisfy the total liens of more than $17,000,000 in five

years or less." Finally, Partin "recommend[ed] that the [c]ourt approve the auction sale of [the property] by Motleys Asset Disposition Group" (Motleys) and asked the court to confirm the report and order judicial sale of the property.

Appellant objected to the report and argued that, without a hearing, the commissioner's conclusion regarding rents and profits was "based on no evidence." Appellant also challenged the commissioner's reliance on the 2021 appraisals, which were "no longer reflective of current market conditions."

Before the court ruled on the initial report, Partin filed an amendment, noting that he had received an unsolicited purchase offer from American Real Estate Partners LLC (AREP)[1] for $16.5 million. He reported that Comerica and Choate supported the sale to AREP and that he believed the offer was "preferable to auction." Appellant again objected to the report, this time adding that Partin was acting ultra vires in recommending the sale to AREP.

## II. *Motion Hearing (Commissioner in Chancery Report)*

At an October 2023 hearing concerning the amended report, appellant not only reiterated its objections but also asked the court to follow the statutory "two-step process" and appoint a special commissioner to solicit purchase offers. Comerica and Choate requested to proceed with AREP's purchase offer. The court confirmed the commissioner's amended report and appointed Partin as the special commissioner for the property's sale. The court instructed Partin "to make the sale of the property for the highest price he is able to effectuate" by December 14, 2023.

In its written order confirming the amended report, the court made factual findings: first, that Partin was "qualified to act as a special commissioner"; and second, that the property's "rents and profits" were "not sufficient to satisfy the liens . . . within a five-year period." Therefore, the

---

[1] The offer was made by CTP IV, LLC, a venture of AREP and Chrisia Piscataway Inc., but the parties refer to AREP as the purchaser. We will do the same here.

court ordered that "the [p]roperty should be sold to satisfy the liens." The court authorized the special commissioner to:

> a. Take action to obtain the highest contract price for the sale of the [p]roperty before the next hearing, including private sale as presented in the [a]mended [r]eport if appropriate, or accepting alternate offers;
>
> b. Enter into such agreements, including without limitation marketing or advertising agreements, as may be reasonably necessary to advertise and market the sale of the [p]roperty in a commercially reasonable manner;
>
> c. Incur such costs, including without limitation title search fees, advertising expenses, reasonable marketing fees and expenses, as may be reasonably necessary to advertise the sale of the [p]roperty in a commercially reasonable manner; and
>
> d. Negotiate with parties to enter into a contract for the sale of the [p]roperty.

Finally, the court ruled that any sale or contract for sale would require judicial approval. Appellant's counsel signed the order as "seen and objected to."

### III. *Temporary Injunction Motion*

As recommended in his report, Partin engaged Motleys to auction the property. Appellant then moved for a temporary injunction to stop the auction, arguing that the advertisements were "based on prior outdated appraisals" and would cause the property to be "significantly undervalued" and "effectively serve to cap the amount that any party to the auction would be willing to pay." According to appellant, this inaccuracy would make the auction commercially unreasonable. Appellant submitted a broker opinion of value (BOV) by Jones Lang LaSalle Americas, Inc. (JLL), which estimated that the land value for a data center developer would be $25.2 million and for an industrial developer $29.35 million. JLL attached several disclaimers, including that the BOV was "not a certified appraisal of the market value of the property" and that it was "not intended to be used for any legal purpose including approval of a mortgage loan, modification of a mortgage loan,

- 4 -

ownership or partnership resolution, divorce/property separation, estate settlement, bankruptcy proceedings or any other purpose where real estate value is needed."

During a December 5, 2023 hearing on the temporary injunction motion, appellant called Mark Motley, Motleys' president, to testify that the auction had not yet produced any bids.[2] On cross-examination, Comerica qualified Motley as an expert in selling commercial real estate, and Motley testified to the efforts his company had made to advertise the auction and stated that interest in the auction was "extreme[ly] high." Motley acknowledged that the promotional materials described the property as being "appraised at $18.9 million"; but he also testified that, in his experience, appraisals did not limit the interest in a property but rather promoted sale. In his view, it was "baseline due diligence" for potential purchasers to review "whatever information they could get their hands on," including the 2021 appraisals, which contained a warning that they were "as-is."

Appellant then called James E. Appich, JLL's executive managing director, as an expert in commercial real estate and BOV. Appich testified that a data center would be the best value use of the property and that the midpoint price of the property for such use was close to $29 million. He admitted that, unlike the data center use, the BOV regarding potential industrial use of the property assumed that the different structures on the property were completed. Appich also acknowledged that a purchaser would likely "need as much detail as possible" regarding the property. Appellant then requested a temporary injunction, arguing that it would otherwise suffer irreparable harm and that all factors that needed to be considered weighed in favor of granting the injunction.

The court denied the motion, finding it "entirely speculative" that appellant would suffer irreparable harm in the absence of preliminary relief. It stated that "[t]he argument that the [$]18.9

___

[2] The auction was originally scheduled to take place over the course of four days from December 4 to 7, but, in response to the injunction motion, it was rescheduled for December 7, 2023.

million is a cap is erroneous. It's not a cap. It's just an indication of what the appraisal was in 2021[,] [which] is very clearly labeled . . . as-is." The court continued:

> So just on that alone I can't grant the temporary injunction because I cannot find that [appellant] is likely to suffer irreparable harm in the absence of that preliminary relief. I'm not sure that they are likely to succeed on the merits to the point where I could grant a temporary injunction either. The balance of equities, there's an argument for both sides but it is in fact [appellant] who has put us in this position today by failing to pay their creditors. And at this point I don't believe an injunction is in the public interest because creditors do have a right to be paid.

### IV. *Special Commissioner's Reports*

On December 13, 2023, Partin filed an initial special commissioner's report, explaining that he had signed a purchase agreement with AREP for $16.5 million, subject to court approval, and that AREP paid a $1.65 million deposit.[3] He also stated that, accordingly, the opening bid for the auction was set at $16.5 million; but the auction did not produce any bids above that. The AREP agreement was "as-is," included a $500,000 "break fee," and gave AREP the option to match any other purchase offers above 110% of AREP's offer. Under the agreement, the commissioner could only consider other bids that were at least 110% of AREP's offer ("stalking horse" provision). Partin also reported that Motleys received a purchase offer from the Hourigan Group (Hourigan) for $20 million with a 90-day due diligence period, which was later reduced to 75 days. At a motion hearing, Partin described the Hourigan offer as "non-conforming" and "not a real bid," stating that he only included it "for value and if the parties . . . thought it was worth pursuing."

At the motion hearing, appellant reiterated that the process had been commercially unreasonable and unfair, that Partin had acted ultra vires, and that he had a conflict of interest because Comerica had advanced Partin's fees. Appellant argued that the sales process favored

---

[3] Partin later filed an amended report that included an addition to the AREP purchasing agreement.

- 6 -

AREP, citing an email in which Partin offered AREP the break-fee provision and wrote, "[M]ost important, AREP is protected in the auction process with Motleys." Appellant also cited Partin's email to AREP's attorneys regarding the Hourigan offer, saying that it would "net . . . less than 20 million" and therefore AREP did not need to "match 20 million to be in a better position." Partin explained that, after receiving the AREP offer, he wanted to be certain that the sales price would be at least $16.5 million and that, for AREP to match the Hourigan offer under the agreement, he would have to accept the Hourigan offer, which he did not feel was prudent because it was contingent.

Both Comerica and Choate asked the court to approve AREP's purchase. The court approved the report and ordered the sale to AREP. It found that Hourigan had made "not an offer" but rather a request for time "just . . . to look at" the property with an option to abandon the purchase at any point. The court emphasized that the auction produced no bid over $16.5 million and that there was no evidence of a chilling effect by the AREP agreement. The court further stated that "[t]he $29 million valuation . . . is, in the [c]ourt's understanding, for a completed data center use building and property" and that therefore the valuation was not reasonable. Finally, the court found "the only appraisals that we do have are the, admittedly, [two]-year-old ones that were for 16 and 18.3, 16.5 and 18.3" million dollars, so the price did not shock the conscience of the court.[4] This appeal followed.

ANALYSIS

I. Commissioner in Chancery's Report

Appellant first assigns error to the court's confirmation of the commissioner in chancery's report, arguing the report lacked "any evidentiary basis on [p]roperty value and rents." Appellant

---

[4] Because appellant failed to post bond to stay the judicial sale pending this appeal, the sale was closed on September 9, 2024. The confirmation of such sale may be set aside on appeal within 12 months. Code § 8.01-113.

also contends that the commissioner in chancery failed to conform to the decree of reference, Rule 3:23, and Code § 8.01-609.

"On appeal, a decree which approves a commissioner's report will be affirmed unless plainly wrong." *Daly v. Shepherd*, 274 Va. 270, 273 (2007) (quoting *Roberts v. Roberts*, 260 Va. 660, 667 (2000)).

Code § 8.01-609 sets out the commissioner in chancery's duties, providing that "[e]very commissioner shall examine, and report upon, any matters as may be referred to him by any court" and that "[t]he proceedings before a commissioner in chancery shall be conducted as set forth in this chapter and the Rules of Court." Code § 8.01-610 further provides that "[t]he report of a commissioner in chancery shall not have the weight given to the verdict of a jury on conflicting evidence, but the court shall confirm or reject such report in whole or in part, according to the view which it entertains of the law and evidence." The report "should be sustained unless the trial court concludes that the commissioner's findings are not supported by the evidence." *Hill v. Hill*, 227 Va. 569, 576-77 (1984); *see also Daly*, 274 Va. at 273 (quoting *Roberts*, 260 Va. at 667). "This rule . . . is not applicable to pure conclusions of law contained in the report." *Daly*, 274 Va. at 273 (quoting *Roberts*, 260 Va. at 667).

Rule 3:23(b) provides that "[i]t is the duty of the commissioner to proceed with all reasonable diligence to execute the decree of reference." The Rule further states that "[a] commissioner may require the production of evidence upon all matters embraced in the decree of reference." Rule 3:23(c). "The commissioner has the authority to call witnesses . . . to testify and may examine them upon oath." *Id.*

Here, the decree of reference instructed Partin to "tak[e] information and evidence" and to report on the "fee simple and potential rents and profits value" of the property. Partin concluded that the property "as-is" had "little to no potential rents and profits value" because "the

improvements on the property remain incomplete." It is uncontested that the structure on the property remains unfinished and has been open to the elements for years. From that, Partin could reasonably conclude that the property would not generate sufficient rents and profits within five years. Partin asked appellant to stipulate to that fact, but appellant refused to engage in "any discussion of rent value" without first obtaining a new "professional evaluation of the property." Appellant submitted the two 2021 appraisals "for the record," but refused to discuss property value. The fact that the AREP offer of $16.5 million was aligned with the appraisals, though on the lower end, supported Partin's and the court's conclusion. Appellant alleges that Partin should not have used the 2021 appraisals in his valuation of the property because they were intended only as a reference when demanding a new evaluation. But a commissioner is free to use evidence as he finds appropriate. *See* Rule 3:23.

Appellant also posits that the commissioner in chancery was required to conduct a "formal proceeding" on the valuation of the property. Neither Rule 3:23 nor Code §§ 8.01-607 to -619 require the commissioner to collect evidence in a particular way, such as a formal hearing. In fact, Rule 3:23 provides that the commissioner in chancery "*may* require the production of evidence upon all matters embraced in the decree of reference" and he "*may* examine [witnesses] upon oath." Rule 3:23(c) (emphases added). "[T]he word 'shall' is primarily mandatory in effect, and 'may' is primarily permissive in effect, [but] 'courts, in endeavoring to arrive at the meaning of a written language, . . . will construe "may" and "shall" as permissive or mandatory in accordance with the subject matter and context.'" *TM Delmarva Power, L.L.C. v. NCP of Va., L.L.C.*, 263 Va. 116, 121 (2002) (quoting *Pettus v. Hendricks*, 113 Va. 326, 330 (1912)). Nothing in the Rules or statutes suggests that the "may" in this context is mandatory.

Citing to Rule 4:0(b), appellant argues that because the decree of reference asked the commissioner to "tak[e] information and evidence," the commissioner was required to conduct "a

- 9 -

formal proceeding."[5]  But if the court meant to require the commissioner to hold a formal hearing, it would have included that language in the decree or raised the issue during the hearing on whether to confirm the commissioner's report.  The court did neither.

Because the commissioner in chancery's report was supported by the undisputed evidence showing the building on the property was unfinished and because there was no requirement of a formal hearing, the commissioner's report was not plainly wrong.  The circuit court therefore did not err in confirming the report.  *See Daly*, 274 Va. at 273.

## II.  Temporary Injunction

Appellant contends the court erred in denying its motion for a temporary injunction because the special commissioner was not authorized to auction the property and because the auction was commercially unreasonable.  Appellant claims that the sale was commercially unreasonable because the advertisement stated that the property was "appraised at $18.9 million" when current market value was $29 million.  Appellant also argues it suffered irreparable harm and that the balance of equities was in its favor.

On appeal, a circuit court's decision to grant or deny a temporary injunction is reviewed for abuse of discretion.  *See May v. R.A. Yancey Lumber Corp.*, 297 Va. 1, 18 (2019).  "The abuse of discretion standard 'rests on the venerable belief that the judge closest to the contest is the judge best able to discern where the equities lie.'"  *Bailey v. Commonwealth*, 73 Va. App. 250, 265 (2021) (quoting *Hamad v. Hamad*, 61 Va. App. 593, 607 (2013)).  "It requires an appellate court to 'show enough deference to a primary decisionmaker's judgment that the [reviewing] court does not

_____

[5] Rule 4:0(b) provides as follows:

> No provision of any of the Rules in this Part Four affects the practice
> of taking evidence at trial in any action; but such practice, including
> that of generally taking evidence ore tenus in actions upon claims
> arising at law and of generally taking evidence by deposition in
> equitable claims, continues unaffected hereby.

- 10 -

reverse merely because it would have come to a different result in the first instance.'" *Id.* (alteration in original) (quoting *Lawlor v. Commonwealth*, 285 Va. 187, 212 (2013)). "Only when reasonable jurists could not differ can we say an abuse of discretion has occurred." *Thomas v. Commonwealth*, 44 Va. App. 741, 753, *adopted upon reh'g en banc*, 45 Va. App. 811 (2005).

"Granting or denying a temporary injunction is a discretionary act arising from a court's equitable powers." *May*, 297 Va. at 18. Rule 3:26 establishes as a threshold requirement that "[a] court may issue a preliminary injunction only if it first determines that the movant will more likely than not suffer irreparable harm without the preliminary injunction." Once a court finds that the threshold has been met, the court must determine whether three factors support the issuance of the injunction: (1) "the movant has asserted a legally viable claim based on credible facts . . . [that will] more likely than not succeed on the merits"; (2) "the balance of hardships . . . favors granting the preliminary injunction"; and (3) "the public interest, if any, supports the issuance of a preliminary injunction." Rule 3:26. Code § 8.01-628 provides that "[n]o temporary injunction shall be awarded unless the court shall be satisfied of the plaintiff's equity."

Here, the court did not abuse its discretion by denying appellant's motion for a temporary injunction. The order adopting the amended report of the commissioner in chancery appointed Partin as special commissioner and authorized him to conduct the sale and "[t]ake action to obtain the highest contract price . . . before the next hearing, including the private sale as presented in the [a]mended [r]eport if appropriate, or accepting alternate offers." Partin then engaged Motleys to organize an auction, ensuring that anyone interested in buying the property at a higher price than AREP's $16.5 million had a chance to do so. There were no bids during the auction.

The mere fact that the promotional material listed the property as "appraised at 18.9 million" does not make the auction commercially unreasonable. Both Appich and Motley testified that any

serious investor would read all materials available before making a bid and therefore would notice that the two appraisals were from 2021, knowing that the value has increased since then.

Nor did the court err in finding that the equities did not favor appellant. As the court noted, it was appellant "who has put us in this position today by failing to pay their creditors." Both Comerica's judgment and Choate's mechanic's lien were accruing per diem interest. Any delay in the sale—premised on mere speculation that some investor may be willing to pay more than AREP's $16.5 million—only served to increase appellant's debt. Although there are arguments for the equities on both sides—indeed, all parties would profit from a higher price, but no such higher price is guaranteed—appellant could have sold the property on its own before a judicial sale became necessary. We also agree with the circuit court that an injunction delaying the auction was not in the public interest, considering creditors' rights to payment. Thus, the court did not abuse its discretion when denying appellant's motion for a temporary injunction.

### III. Special Commissioner's Amended Report

Appellant argues that the court erred in confirming the amended report of the special commissioner and ordering the sale of the property. According to appellant, the special commissioner had a conflict of interest, the $16.5 million sales price was grossly inadequate, the court should not have rejected the $20 million Hourigan offer, and the special commissioner unfairly favored AREP. We address these arguments in turn.

### A. Conflict of Interest

Appellant contends that Partin had a conflict of interest because Comerica advanced his fees for acting as commissioner in chancery and later special commissioner.

Commissioner's fees are determined by statute. *See* Code §§ 8.01-609.1, -109. Code § 8.01-609.1 provides that "[a] commissioner shall not be compelled to make out or return a report *until his fees therefor are paid or security given him* to pay so much as may be adjudged appropriate

- 12 -

by the court to which the report is to be returned." (Emphasis added). "The commissioner [in chancery], like a judge, must be wholly disinterested[,] . . . free from all suspicion of interest or liability to bias." *Shipman v. Fletcher*, 91 Va. 473, 481 (1895).

Here, the court found in its decree of reference that Partin was qualified to serve as commissioner in chancery. The decree further provided that "all costs of and commissioner's fees in this matter and the sale of the [p]roperty shall be paid from the proceeds of the sale or rental of the [p]roperty." Neither the decree of reference nor the Code prohibit advancing the commissioner's fees. All involved parties were aware that the commissioner would ultimately be paid from the sale proceeds pursuant to the decree of reference. Comerica's advancement of the fees is therefore inconsequential.

Like the commissioner in chancery, the special commissioner's fees are also fixed by statute, meaning "the General Assembly intended that such commission be paid from the proceeds of the sale." *Homeside Lending v. Unit Owners Ass'n of Antietam Square Condo.*, 261 Va. 161, 168 (2001). Unlike a commissioner in chancery, however, a special commissioner responsible for the judicial sale of property is not required to be impartial. Indeed, in *Teel v. Yancey*, 64 Va. (23 Gratt.) 691 (1873), the Supreme Court found no issue with the appointment of one of the plaintiffs themselves as a special commissioner to conduct a sale because "a commissioner is but the agent of the court" and "his acts are subject to the control and superintendence of the court." *Id.* at 697. The court therefore did not err in overruling appellant's objection asserting a conflict of interest.

B. Sales Price

Appellant claims that the $16.5 million sales price was grossly inadequate because it was (1) "even lower than the value ascribed to the [p]roperty in the outdated COVID-era 2021 appraisals," (2) $12 million below market value according to Appich, and (3) based on a "misunderstanding of expert testimony and record evidence."

"A confirmation of a sale is a matter within the sound judicial discretion of the court, in view of all the circumstances, and sales fairly made should not be set aside merely because the purchaser has gotten a good bargain." *Schweitzer v. Stroh*, 182 Va. 842, 849 (1944). The court "must measure the adequacy of the price obtained based on the entire record, and the court should exercise its discretion to refuse to accept the bid price only if it is so inadequate that it shocks the court's conscience, or if there are additional circumstances of unfairness." *Jones v. Jones*, 249 Va. 565, 572-73 (1995). "[T]he highest bid made at an open judicial sale, fairly conducted, after full notice, in the face of such competition as can be attracted, is a fair and just criterion of the value of the property at that time." *Id.* at 572 (quoting *Page v. Commonwealth*, 176 Va. 351, 353 (1940)). For example, in *Prettyman v. Chandler's Administrators*, 174 Va. 99 (1939), the Supreme Court found that an offer for $3,550 for a property appraised at $8,100, roughly 44% of its appraised value, "was not grossly inadequate." *Id.* at 104.

Here, the commissioner retained Motleys to advertise and auction the property. Testimony established that the auction generated widespread interest. AREP's offer price was set as the opening bid for the auction, ensuring that the property would not sell for anything below $16.5 million. The property was previously appraised at $16 to $18.3 and $16.5 to $18.3 million. Although slightly lower, the AREP offer of $16.5 million was in line with the appraisals. Further, the fact that no one made a higher bid than the opening bid of $16.5 million is an indication that the price was neither unfair nor grossly inadequate. *See Jones*, 249 Va. at 572.

Appellant also contends that the court misunderstood Appich's testimony and therefore erred in approving the sale. Appich had testified that the then-current value of the property, with the uncompleted building, was around $29 million, if the land was to be used as a data center. The court's apparent misunderstanding is irrelevant because JLL's BOV, on which Appich relied, contains a disclaimer that the "BOV is not a certified appraisal of the market value" and it "is not

- 14 -

intended to be used for any legal purpose . . . where real estate value is needed." Further, even if Appich was correct and the current value of the property was $29 million, the sales price would still not be grossly inadequate because the $16.5 million would be approximately 57% of that value. *See Prettyman*, 174 Va. at 104 (finding that a purchasing price that was roughly 44% of the property's appraised value, "was not grossly inadequate"). The sales price was therefore not grossly inadequate, and the court did not err in approving the sale.

### C. Hourigan Offer

Appellant argues that the court erred in rejecting the Hourigan offer because it was a "real" offer and the commissioner was required to obtain the highest purchase price. Appellant further contends that the commissioner acted ultra vires when he signed the AREP purchasing agreement before the auction without obtaining prior court approval.

"[O]btaining the highest price for the property . . . is the controlling purpose and prime object of a judicial sale." *Fine Acres, Inc. v. Whitehurst*, 206 Va. 66, 70 (1965). "[T]he highest bid made at an open judicial sale, fairly conducted, after full notice, in the face of such competition as can be attracted, is a fair and just criterion of the value of the property at that time." *Jones*, 249 Va. at 572 (quoting *Page*, 176 Va. at 353). In *Prettyman*, the Supreme Court found that the trial court erred in accepting a bid post-auction that was 15% higher than the highest auction bid because although the "object of a sale is to secure the best price for the property, . . . this result can be best accomplished, not by accepting every upset bid offered[,] . . . but by the establishment of and adherence to rules which will inspire confidence in the stability of judicial sales." *Prettyman*, 174 Va. at 103 (quoting *E.A. Watkins & Bros. v. Jones*, 107 Va. 6, 8 (1907)).

Here, unlike in *Prettyman*, the court found that the Hourigan offer was "not an offer" but a request for time "just . . . to look at" the property, because Hourigan could abandon the purchase at any point. Further, AREP had already signed a purchasing agreement at that time, making the

AREP offer a certainty. Although Partin described the Hourigan offer as one of two "valid offers" in his report, he also later described it as "non-conforming." The commissioner was only the agent of the court, and the court was not bound by the commissioner's report but retained authority to review the findings and recommendations. *See Teel*, 64 Va. (23 Gratt.) at 697 (describing the commissioner as being under the supervision of and the sale subject to approval by the court).

Appellant also claims that, contrary to the court's conclusion, the "Hourigan offer was not contingent on financing." But under the headings "Contingencies" and "Feasibility Period" the Hourigan offer reads as follows:

> If [p]urchaser is not satisfied in its sole and absolute discretion with all aspects of the [p]roperty (including zoning) or the [m]aterials, or has not obtained financing upon terms and conditions satisfactory to [p]urchaser, then [p]urchaser shall have the right, upon written notice to [s]eller prior to the expiration of the [f]easibility [p]eriod, to terminate this [a]greement, in which event the [d]eposit shall be refunded in full to [p]urchaser and the parties shall have no further obligation or liability to another . . . .

Similarly, appellant's claim that the commissioner acted ultra vires is without merit because the court order appointing and authorizing Partin empowered him to take action for the sale of the property, "including the private sale as presented in the amended report . . . or accepting alternative offers" as well as "[n]egotiat[ing] with parties to enter into a contract for the sale of the [p]roperty." Thus, the order authorized Partin to do exactly that what appellant now claims is ultra vires, i.e., signing a purchasing agreement to sell the property "as presented in the [a]mended [r]eport." The purchase agreement itself specified that the sale was subject to judicial approval. Further, the Supreme Court has held that "[t]he court, in confirming a sale, may ratify various irregularities in the proceeding of the commissioner of sale, even the changing of terms of sale, and supply or cure all defects in the execution of its decree, except those founded in defect of jurisdiction, or in fraud." *Langyher v. Patterson & Bash*, 77 Va. 470, 473 (1883). The fact that Partin signed the AREP purchasing agreement before the auction therefore is inconsequential.

Because the Hourigan offer was not a bid at the auction and Hourigan had the "sole and absolute discretion" to terminate the offer, and because Partin did not act ultra vires, we find no error in the circuit court's rejection of the Hourigan offer.

## D. Sales Process

Appellant posits that "unfairness is a factor to be considered in reviewing orders to confirm judicial sales" and that this sale was unfair because the AREP agreement contained a "stalking horse provision" which precluded the commissioner from accepting or negotiating another offer for purchase that was less than 110% of the AREP offer. Further, the fact that AREP had an option to match any other offers after the close of the auction "discourag[ed] other bidders" and the whole "process favored AREP over other bidders," as evidenced by the break fee in the AREP agreement.

As stated above, "[t]he court, in confirming a sale, may ratify various irregularities in the proceeding of the commissioner of sale, even the changing of the terms of sale, and supply or cure all defects in the execution of its decree, except those founded in defect of jurisdiction, or in fraud." *Langyher*, 77 Va. at 473. Further, "before confirmation[,] the whole proceeding is *in fieri*,[6] and under the control of the court. *Until then the accepted bidder is not regarded as the purchaser*. His contract is incomplete, and he acquires by his bid no independent right to have it perfected." *Terry v. Coles' Ex'r*, 80 Va. 695, 703 (1885) (quoting *Brock v. Rice*, 68 Va. (27 Gratt.) 812, 815 (1876)); *see also Austin v. Dobbins*, 219 Va. 930, 935 (1979).

Here, the AREP purchasing agreement is directly conditioned on the court's approval of the sale. But Article 11.3 of the agreement—the "stalking horse" and break-fee provision—states that "[t]he provisions of this Article 11 are immediately binding and not subject to approval of the [c]ourt." Comerica and Choate contend that Article 11 is contrary to law and therefore was not

---

[6] *In fieri* is defined as "pending or in the course of being completed." *In fieri*, *Black's Law Dictionary* (12th ed. 2024).

binding until approved by the court. We agree. An "accepted bidder is not regarded as the purchaser" until the court confirms the sale. *See Terry*, 80 Va. at 703. Partin was the court's agent and until the court confirmed Partin's action of signing the AREP purchasing agreement, the agreement remained unenforceable.

Further, there is no evidence in the record that other bidders knew about AREP's agreement or the "stalking horse" provision therein. Thus, the provision could not have stifled the bidding process. Appellant even concedes that bidders would not have been aware that the commissioner could only consider bids of 110% or more of AREP's offer or that AREP had the right to match any offer above that amount under the purchasing agreement. The provisions therefore could not have "discourag[ed] other bidders."

To show that the entire "judicial sale process favored AREP over other bidders," appellant relies on Partin's emails to AREP's counsel in which Partin offered AREP the break-fee provision and wrote, "[M]ost important, AREP is protected in the auction process with Motleys." Partin also advised AREP that the Hourigan offer would "net . . . less than 20 million" and therefore AREP did not need to "match 20 million to be in a better position." But the court was free to accept Partin's explanation that he wanted to ensure that the price of the property would at least be $16.5 million and that for AREP to match the Hourigan offer, he would have to accept it, which he did not feel was prudent because it was contingent. *See Langyher*, 77 Va. at 473.

### CONCLUSION

For these reasons, we find that the circuit court did not abuse its discretion in confirming the reports and approving the sale to AREP, and we affirm.

*Affirmed.*